Good morning, Your Honor. Tony Farmani on behalf of Ms. Jones. Good morning. Your Honor, as the Court is well aware, this case requires the Court to determine first, was this a custodial interrogation, and whether the State Court's finding that it wasn't violated it. And the clearly established law here is fairly straightforward. Would someone in Ms. Jones' position, given all the circumstances leading up and including the interrogation, have felt free to leave? Just get up and leave the interrogation room. And I submit to you, Your Honor, that absolutely is not – it would be fictional to conclude that she had any opportunity to say, I want to leave the interrogation room. And I say this based on the objective facts, Your Honor. You have Mr. Rudas being murdered on May 12th. By the time that Ms. Jones is encountered by Detective Zirkle, we know that they found Mr. Rudas' truck with blood in it. We also know that they've been looking for Ms. Jones, because the lady that she was staying with has told her, you can't come back in here, police are coming here looking for you. We know Maligan, the person who instigated and committed this heinous crime, was arrested. We know that the police officers have already talked to one of the main witnesses. So that brings us to the day that Detective Zirkle, who frankly probably wrote the book on the two-step interrogation technique that was subsequently condemned by the U.S. Supreme Court, approaches Ms. Jones. We don't know what the approach, what the encounter is about, but what we do know is that initially he does tell her, look, you don't have to come with me, you're not under arrest, but let me take you into my car. Let's go in my car and I'll take you to the police station. So she sits in the car. We don't know what's going on in the car except for the fact that in the interrogation, there is some references that he's telling her in the car that you should tell the truth, you should come forward and tell me what's going on, and he takes her into it. So we know there's some interrogation going on in the car. Now, was she in handcuffs at that time? She was not in handcuffs at that time. Do you contend that she was arrested at that point? Pardon me, Your Honor? Was she arrested at that point? I don't think she was arrested in the formal sense of the Fourth Amendment, Your Honor. Okay, so so far so good. So she's in the car, she's not handcuffed. And let's assume for a moment that she's able to at that point say, hey, why don't you stop over, I'm going to get out. Then they get to the police station. Pardon me? Then they get to the police station. Then they get to the police station. She's waiting for half an hour before she goes into the interview room. As soon as she gets into the police station, for someone who doesn't have a car, who the police have been looking for, who has been involved in a heinous crime, who police have already spoken to several witnesses, who the police on the way over is telling her, look, just tell the truth, probably has told her that we already know what's going on, as he does at the beginning of the interview. So I think at that point, right there and then, I would, under AEDPA's deferential standard review, I don't think you can say that she was custody at that point. But when she goes into that interrogation room, and the police starts talking to her, and at the beginning of the interrogation tells her that we know what's going on, we know everything, we know who's involved, just come forward and tell us where the body is. That's essentially what the police tells her. So at that point in time, you've got a suspect who, for all intents and purposes, doesn't feel like she's either a material witness or an actual perpetrator of the crime. She doesn't feel like she's able to leave. No one in that position would be free to leave. Did they tell her at that point she was free to leave? He did tell her at the beginning. But we all know those were just words. Everybody, I mean, the reality, we need to look at it from the objective standard, as the court is aware. And to me, let's assume even at that point, at that point in time, when the officer is telling her that we know what's going on, in so many ways it's telling her that you're a suspect in this crime. Let's just assume even at that point she's not in custody. But what happens after? We know for Miranda purposes, inculpatory and exculpatory don't matter. Whatever she says at that point is going to be admitted at trial. That's what this whole interrogation was about, to get her to open up and tell the officer what happened. So we don't care what Jones, what Ms. Jones is really thinking here, that she's trying to save herself somehow by coming forward and implicating other people in the crime. We don't care about that. What we do care about is, is she able to leave? Does she feel like she can just get up and say, I'm going to leave? Now, it's interesting because the state trial court, when the state trial court was looking at the first issue, which was the first set of statements by Ms. Jones, says this. The status, what was the state of mind of an objective person at the beginning of that interview? And it says that. Why? Because it says, it is abundantly clear the more incriminating statements Jones made during the course of the interview, the less likely it was that she would be able to leave. This is the trial court saying it. Trial court had an opportunity to look at the video, the audio, listen to the audio tape, and says that the more incriminating statements she made, it became more clear that she wasn't able to leave, but that's not the standard. We look at the beginning of the interview. That's absolutely an incorrect statement of the law, Your Honor. I say this because of U.S. v. Kim. I mean, even before U.S. v. Kim, plenty of Supreme Court case law has said you look at the totality of the circumstances of the interrogation. It never says you look at the beginning of the interrogation, and then U.S. v. Kim says voluntary initiation of contact with police cannot be, under any circumstances, the end of the inquiry into whether a defendant was in custody during the encounter. Because when you're sitting there and you're basically telling the officer, I've committed this, I've been involved in this crime, you're not free to leave. You're not free to leave when you're providing details leading to the actual murder. And then you go forward and give them the whole scenario, telling them you hit them with a flashlight, that, you know, just a whole bunch of stuff, Your Honor. Again, it doesn't matter what she was saying here. What matters is where the statement is going to be admitted at trial. And we know that we're going to be admitted at trial. Counsel, I probably would be inclined to agree with you, but we're looking at this from the AEDPA standard. Correct, Your Honor. And we have to ask whether the California court was objectively unreasonable in the decision that it made. And so you're kind of arguing to us as though this were a direct appeal. How is the California court of appeals objectively unreasonable? Well, Your Honor, as I mentioned a little bit ago, the trial court itself made an incorrect determination of the law. What she said, what the trial judge said in this circumstance was, the standard is what was the state of mind of an objective person at the beginning of that interview. And that is not the standard. Right. But we have to look at the last reason. Which was the court of appeal. Right. And the court of appeal pretty much adopts the trial court's reasoning. It goes through a little bit of, you know, what the facts were in the interrogation, what Michelle Jones actually said. But it never talks about what about the fact that Michelle Jones made incriminating statements? What about the fact that Michelle Jones was in that interrogation for three hours? What about the fact that she was, in fact, arrested after the interrogation had concluded? What about all those facts? None of that is in that opinion. So given the court the benefit of doubt, even given the court the benefit of doubt that this was, and the initial encounter was consensual, the fact that Miss Jones is sitting there and implicating herself in a murder, at some point I have not come across, I'll submit to you, Your Honor, I've looked at many, many cases, and I haven't found one case on Miranda that says someone in a three-hour interrogation is not in custody. Typically, you have a 30-minute, at most, at most hour and a half, two hours, but the person goes home after the two hours. Miss Jones didn't go home. Now, Miss Jones, you know, she's not an angel by any means. But, you know, the Constitution obviously protects the guilty and the innocent the same, the same way. Was this confession the product of the whole of Miss Jones' free will? Has she known about her Miranda rights? Would she have confessed? We know that when she was told of her Miranda rights, that she did, in fact, go and locate the body. That's another issue, I think, altogether. I know that the State is saying that the custody determination is a prerequisite to the Siebert v. Missouri, and I've read opinions from this Court that make that assumption as well. But that would be if the second statement itself was not significant. The second statement itself that she makes, which is, I was with Maligan when he was arrested. She describes what she's wearing. I went to a baseball game after the murder. And the prosecutor, interestingly enough, hones on that. And throughout the closing argument, the prosecutor keeps on saying, this is the woman who went to a baseball game after the murder. And this is a woman that had some type of relationship with Maligan. Why would she be with Maligan after, when he's arrested? So you've got this, and she takes him to the body. She takes Detective Zorka to the location of the body. I think that by itself, right, there is a violation, no matter, I mean, the fact that he gave her Miranda warnings, which is ineffectual under Missouri v. Siebert. Wholly aside from the custody issue with regard to the first set of statements, they're interrelated if we're trying to, if we're trying to only exclude statements that are identical to the original statements. But here we have more. Here we have more. Now, the question becomes whether the second set of statements are substantial injuries. In fact, I think that's a tough question to make. But it is a de novo review at that point for that particular set of statements, because the court of appeal never engages in that analysis, never engages in the prejudice analysis. I don't think it would even matter because you have to do the substantial injuries case on its own. But, you know, what we really have here is someone who is involved in a heinous crime. And I think the ultimate question here is, would a reasonable person would have felt that, given the circumstances, would have felt that she's able to just get up and leave? And the answer to that question is absolutely no. And the State court's determination was objectively unreasonable, and contrary to you, because they only looked at the initial encounter. That's all they did. They looked at the initial encounter. They never went any further. Unless the Court has any questions, I would like to reserve the remainder of my time. Thank you, Mr. Kermani. Good morning. May it please the Court, Daniel Rogers, Deputy Attorney General for Respondent. Your Honor, with respect to the Miranda issue, Yarborough v. Alvarado is directly on point in this case. And as Judge Wardlaw pointed out, this is an AEDPA case. We clearly have a merits determination by the California Supreme Court, applying McGill's doctrine and looking through to the California Court of Appeal, that is entitled to deference. Yarborough addressed the same issue, the State court's determination of custody under Miranda, and provided an analytical framework that a Federal court applies in determining the reasonableness of that State court application. And as in Yarborough, in this case, Respondent would agree there are two sides to this argument. And Respondent would certainly not dismiss outright the position that Ms. Jones was in custody. However, there is the other side that the State court ultimately adopted, and we would argue correctly adopted, and that is that Ms. Jones was not in custody. That is the determination that is entitled to deference, and as cases such as Yarborough, Richter, tell us, the Federal court in that instance is going to look at, can a fair-minded jurist come to that conclusion? And the answer to that question is clearly yes. And that forecloses habeas relief on this claim. Now Mr. Farmani made the point that the superior court made a legal error. What's your answer to that? Well, I would first of all disagree with a related point that Mr. Farmani makes. The court of appeal did not simply adopt the superior court's reasoning wholesale. If one looks at the court of appeal opinion, there is no discussion of the Miranda custody test being limited to the initial, the beginning stages of the questioning process. So to the extent the superior court may have made an error, I would, as an aside, I would characterize that as dicta, if anything. It's an offhand remark that the superior court is making unrelated to the issue that is before. The superior court clearly understood that her subjective intent, her subjective intent is irrelevant and we're looking only at the objective issue here. So, but be that as it may, even giving that statement the character that counsel has afforded it, it doesn't matter because the court of appeal conducted its own independent analysis, looked at the totality of the circumstances, and that is repeatedly stated in the court of appeal opinion. And what happened at the beginning is a circumstance, and what happens throughout the process, these are additional circumstances. Now, Mr. Farmani makes, emphasizes a number of times that the court of appeal does not, Ms. Jones makes incriminating statements over the course of this interview and obviously that's incontestable. Of course she does. That is a circumstance. That is not the end-all, be-all of the analysis. The Supreme Court has never abandoned the totality of the circumstances test. There are other circumstances at work here. Ms. Jones, the idea that the police are looking for her, the police never indicate that they're looking for her as a suspect in a crime. They want information from her. A reasonable person would conclude from that that they're sought as a witness. Ms. Jones is repeatedly asked to tell us what happened so we can give peace to the family, so the victim deserves this, and she agrees with all of that. She says, I want to help you. He was my friend. He does deserve that. His family does deserve that. So I think the factual findings of the trial court that this was not an adversarial interrogation. When one looks at the transcript of the interrogation, the first, the bulk of the interrogation is a narrative by Jones. She's telling the officer what happened. He's interjecting here and there, but she's telling her story. She's not being browbeaten. She's not being repeatedly questioned. She's not being grilled, if you will. She's being treated respectfully. She's not being treated the way a suspect might expect to be treated. She is being treated as someone who has important information that that officer needs to resolve the problem that he has identified, which is finding the body and finding out what happened. Let me make... This is a close one, though. I mean, this is really close, because you have, if you go down all the factors, you know, you have the police officer pretty clearly associating her with the crime, and picks her up and takes her to the police station instead of going to the police station. And then there's this whole use of the religious, psychological, leave your trust in God, that's why you're here. Doesn't that border on the coercive? Well, Your Honor, as I said at the outset of my argument, I acknowledge there are two sides here. Now, I take a different position. I think the court does as to which side... I'm saying it's very close. But yes. I will agree that if the State court had come down the other way, I don't think the State court would necessarily have aired it. But that isn't the way the State court came down. And this court does have the AEDPA to deal with. And she was arrested immediately afterwards. Was it after her first statement or her second one? It was after the first statement. Yes. She was arrested. Yes. Right after that. Yes. I would put some other factors out there that just, I mean, we can, again, we can do this for the balance of the argument. Right. You know, other factors. She never asked to leave. She never indicated she didn't want to talk. She never wanted to take a break during that. She was told at the outset, you can take a break, use the restroom, you can get your drink, anything you want to do. She never availed herself of any of those opportunities. So I would say another way to look at this record is that she is coming, she, I can't cite particular... Is there any evidence that she was on drugs or anything at that point when she was taking that interview? I'm not aware of any evidence that she was under the influence of narcotics or alcohol at the point that she was talking to the judge. No.   So there's no evidence that there was any sort of fatigue throughout this whole thing. There's the point in the second interrogation that numerous references are made to her being tired, and obviously, that takes place at 1.15 in the morning. But as far as the first interrogation, which began at 4.30 in the afternoon, I don't see any evidence that there was fatigue at that point. And I am aware of no evidence in the record that there is, that she was under. Certainly, there's no statements to that effect in the interview. So, again, Your Honor, accepting that this may be a close case, Garbaro still provides the answer. In a close case, and logically it sort of makes sense, if the question, if the inquiry is could a fair-minded jurist have reached the decision the State Court did, and it's a close case, obviously, a fair-minded jurist could. A fair-minded jurist could also reach the opposite conclusion. And if this Court were conducting de novo review, I get the sense I might be in trouble. But the question before this Court is not was Ms. Jones in custody. The question again is was the State Court reasonable in determining that she was not. And I think that is critical here. And Garbaro is directly on point. Let me make a brief remark about the Siebert claim. The United States Supreme Court in Siebert, first of all, Siebert is not a new constitutional right. It is a species of Miranda claim. It is, Siebert is addressing a particular tactic that law enforcement in Missouri and other places have used to essentially dilute or nullify the Miranda warnings. Siebert had been arrested. Siebert had been arrested, and that is key. Because what the evil that the United States Supreme Court in Siebert sought to address is the idea that an officer elicits and conducts an un-Mirandaized custodial interrogation, knowing those statements will be inadmissible. Once the cab is out of the bag, he then gives Miranda warnings and redoes the interrogation with the expectation the first one will be thrown out, but the second one will be good. What the United States Supreme Court identified in that case is that a defendant in that position isn't necessarily going to know that at the point they're being asked to waive Miranda, everything they've said is off the table, essentially. You're hiding the ball, and that's the evil that Siebert sought to address. You don't have that here. Because as the State court determined, and my position on Siebert hinges on the State There was no custody here. I'll certainly acknowledge that. But you have the State court determining there was no Miranda violation. All of her statements are admissible. She is arrested and Mirandized, and additional information is elicited in that second interrogation. And it would be wrong had the officer have said, what you said before can't be used. Do you want to waive Miranda and talk to me? That wouldn't have been true. So this is a very different case than Siebert. This is not the two-step interrogation process that the U.S. Supreme Court in that case criticized and found improper. And I think I have covered all of the points that I had hoped to make. So unless the Court has any additional questions. I guess not. Thank you, Mr. Rogers. You're prepared to submit it. Thank you very much. Mr. Farmoni. Tony Farmoni. Do you want to ask a question? Yes. I guess we've got to ask ourselves, why would the officer Mirandize her and then go over the same exact questions? Siebert wasn't limited to Missouri. I mean, if you look at the footnotes, they're talking about California. That's where stuff has happened in California back in 2001, particularly around that time when Ms. Jones was being interrogated. Why would he do that? Because he knows. He knows she was in custody. Now, obviously, he doesn't know ECPA was going to be so restrictive in 2012-2011, but he knows she was in custody. That's the critical factor. None of us knew it. None of us knew it. None of us knew. And I don't think he did either at that point. Obviously, he didn't. That's why he Mirandizes her, because he knows he's in trouble. He knows that he's taken a suspect into custody, and he's basically obtained a confession which will not be admitted in the court. Let me ask you this. You know, Johnny Carson used to say if you buy the premise, you'll buy the bit. If you buy the premise that she was not in custody, and do you agree that the Siebert claim can't succeed? Your Honor, I think it would not succeed with regard to the initial statements. I admit that because of the case law. Now, if you were to make new case law, then you would have to say that it doesn't matter. Now, the Supreme Court hasn't spoken on the issue, but your court has. And they have said that the initial statements, on-board statements, assuming that there would be a violation of Miranda, essentially. So I admit it to that extent. But he got a second set of statements. He got her taking him, taking Detective Zerko to the body, to location of the body, the crime scene. He got her coming back and saying, I went to a baseball game. He got her saying what clothes she was wearing, which was all used at trial. Every single statement was used, either in closing argument or as to tie the evidence. He got her saying I was with Melligan. He got all that stuff. And it's critical here that the jury did ask for a readback of her testimony, excuse me, of her confession. But I think, I think, you know, the counsel says that, you know, the question here is whether the Court of Appeal made an error. And I agree with that. APA does apply to the first custody determination. But, I mean, you look at the Court of Appeal's opinion. Yeah, it does a really good job talking about the law. But then it says, it's got one paragraph dedicated to the whole analysis. It says, in sharp contrast to the facts of Aguilera, Jones was interviewed by a single officer who asked a few questions. And the trial court found applied no pressure of any sort on her. Under totality of circumstances, she wasn't subject to custody interrogation. I mean, what the court doesn't, I think, fails to recognize is that you don't need to put someone in a room, put the lights on them, and beat them with a stick for them to make a confession. He did it very cleverly. Zerko did it very cleverly. But the main question in Miranda is, was her confession a product of her own free will? Has she made that confession if she knew of her rights? Then she has this third, third time they come to her, they try to question her, and she says no. By that time, she's obviously thought about the issue, and she says, I don't want to talk to you guys anymore. Thank you, Mr. Permoni. Thank you, Your Honor. The case just argued is submitted. My compliments to both of you on a very good argument. We'll stand and recess for the day. Thank you.
judges: Cedarbaum, Silverman, Wardlaw